Filed 4/30/26  In re A.P. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re A.P., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>A.P.,<br><br>        Defendant and Appellant. | A175303<br><br>(Solano County<br>Super. Ct. No. JV2500031) |

A.P., a minor, appeals from orders issued after a contested disposition hearing where the juvenile court adjudged him a ward of the court and placed him on probation with terms including a commitment to Solano County Juvenile Hall.  Appellate counsel found no issues for appellate review and filed a brief pursuant to *People v. Wende* (1979) 25 Cal.3d 436.  A.P. was informed of his attorney's actions and of his right to file a supplemental brief identifying any issues he would like the court to consider.

A.P. did not file a brief and our independent review of the record found no appellate issues requiring further review.  Accordingly, we affirm.

1

# I. BACKGROUND

## A. *The Offenses*

Police officers from the City of Fairfield contacted the occupants of a car parked in a red zone. After the driver consented to a search of the vehicle, officers discovered a handgun without a serial number and an extended magazine loaded with nine-millimeter cartridges. These items were inside a backpack A.P. admitted was his. He was arrested and charged in the juvenile court with two counts: felony possession of a loaded firearm in public and misdemeanor possession of live ammunition by a minor. (Pen. Code §§ 25850, subd. (a), 29650.)[1] A.P. was released from juvenile hall on global positioning system (GPS) monitoring after arraignment. A few weeks later, having complied with the terms of his monitoring, he was released from GPS supervision.

At a hearing in June 2025, A.P. admitted the firearm offense as a misdemeanor violation. In exchange, the ammunition charge was dismissed, a referral for informal supervision was planned, and the district attorney agreed not to file a petition on a separate police report. The case was continued to a new date for the disposition hearing. But days before that hearing, A.P. was charged with new offenses. These allegations stemmed from a June 30, 2025, event that was charged as a felony assault (§ 245, subd. (a)(4)) and resisting, obstructing or delaying a peace officer (§ 148, subd. (a)(1).) The incident involved A.P. and others beating a man in the street. A video showed A.P. stomping on the victim's head during the attack. The victim stopped moving and A.P. stomped on his head two more times as others kicked the victim.

---

[1] Undesignated statutory references are to the Penal Code.

As a result of this new arrest, A.P. stayed inside juvenile hall until the probation department approved the home of his grandfather as a placement. The court again released A.P., and again on GPS monitoring, to his grandfather's home with conditions.

Six days after this release, A.P. drove over 110 miles per hour on the freeway to evade law enforcement. During his flight, A.P. exited a freeway, lost control and hit a curb, ran a red light, drove with the headlights off, and drove on the wrong side of the road. He was returned to juvenile hall. But this time the court found him to be a danger to the community and denied his request for release.

On October 15, 2025, a negotiated disposition between the parties was reached. In exchange for giving up his right to trial and to appeal, A.P. admitted three offenses: hindering a police officer in the performance of his duties (§ 148, subd. (a)(1); count 4), misdemeanor evading a police officer (Veh. Code § 2800.2, subd. (a); count 5), and felony battery with serious bodily injury (§ 243, subd. (d); count 6). Count 3 was dismissed.

## B.  *The Contested Disposition Hearing*

At the contested disposition hearing in December 2025, two witnesses testified. Kirsten Shreve, the deputy probation officer who formally interviewed A.P., testified first. She authored a social study that recommended A.P. spend 120 additional days in juvenile hall. Her report cited A.P.'s "failure to understand the severity of the assault on the victim, his brazen behavior placing the community at risk, the failure to demonstrate improved behavior in a custodial setting, and the need for cognitive intervention." During her testimony, the deputy also claimed that A.P. lacked remorse. She believed additional time at juvenile hall would "allow for other interventions and programs" to be completed. These programs

3

included an Aggression Replacement Training which would begin in January and had a spot available for A.P. to enroll. A restorative justice program called Prisons in Education would teach life skills. A.P. could also get a mentor though the Noah Project. Each program would last the recommended 120 additional days in juvenile hall, giving A.P. significant time to complete them and assist his return to the community. On cross examination, the deputy acknowledged that she had not singled out these programs for their possible benefits to A.P. specifically; they were, instead, programs A.P. might join if he was going to be in juvenile hall for 120 days. Deputy Shreve acknowledged that A.P. was already participating in cognitive behavioral therapy "which every youth in custody does" and he had signed up for Trades, a program that teaches skills like carpentry.

The second witness was A.P.'s mother, B.V. She testified that over the time she visited her son at juvenile hall, she believed he showed growth, insight into his conduct, and remorse. She reported that A.P. had started talking about wanting to "do better", "get out and get to work" and to "have more hours in school." In juvenile hall, he was learning the trade of plumbing, but he was also interested "in the electrical." B.V. felt he would "do great" if he came home with her.

Next, A.P. read a letter he wrote to the court. He indicated he had already spent 138 days "in juvie" and learned "so much overall in [his] time between right and wrong." He said it felt "like a blessing being a better person" and he prayed every day and attended church. He telephoned his family every day and enjoyed hearing them laugh and telling him he was missed. A.P. complimented his mother's work to acquire a home "just so [he could] have a [sic] address to use in the courts." He reported that he was "on the edge of graduating from high school", was "in the Trade program . . . for

4

electrician", and "doing [his] probation terms successfully." He hoped the court would see the change in him and give him one more chance to show everyone "that this is promised the last time doing wrong."

The People urged the court to follow the probation department's recommendation to order A.P. to spend an additional 120 days in juvenile hall. The prosecutor contended A.P. had not really accepted responsibility for the firearm charge, having claimed he bought it "from a random dude because he had money." He showed no genuine remorse for the victim who was stomped, dragged into the street, and went in and out of consciousness. The People also pointed out that A.P.'s most recent offense, involving his flight from pursuing law enforcement, reached speeds over one hundred miles per hour. The prosecutor argued that A.P. had not shown "real recognition as to the danger of that conduct."

A.P.'s attorney, on the other hand, pushed for A.P. to be released to his mother. It was argued that whatever remorse or maturity A.P. lacked could not be learned in a program as they were things that develop in a person through family ties, mentoring, and experience with people in different scenarios. Formal probation with counseling was recommended as the best way to help A.P. transition into adulthood, develop life skills, graduate from school, and find employment.

## C.     *The Juvenile Court's Decisions*

The juvenile court reviewed A.P.'s recent behavior referencing the violence of the battery offense, the dangerousness of the car chase, and possession of the firearm. A.P.'s conduct inside juvenile hall also caused the juvenile court to question whether he was truly learning. The court explained the programs that would be available to A.P. in juvenile hall and how they would assist him. It then adjudged A.P a ward of the court, granted

probation with conditions, and committed him to the Solano County Juvenile Hall for a total of 304 days with credit for 184 days. The probation department was also granted discretion to release A.P. from juvenile hall after only 90 days.

## II.  DISCUSSION

As requested by appellate counsel, we have independently reviewed the entire record and found no meritorious issues that could be argued on appeal. (*People v. Wende*, *supra*, 25 Cal.3d 436; *People v. Kelly* (2006) 40 Cal.4th 106.)

A.P. was represented by competent counsel at all relevant times. The juvenile court considered the evidence and arguments presented at the disposition hearing and explained, in detail, why it chose to follow the recommendation of the probation department. These reasons included public safety, references to the court's several failed attempts to afford A.P. lower levels of supervision in the community, and the programming available at juvenile hall that would address A.P.'s behavior.

## III.  DISPOSITION

The judgment is affirmed.

_____

SMILEY, J.

WE CONCUR:


_____

HUMES, P. J.


_____

BANKE, J.